Steven J. Mirsky (SBN 297370)
**MIRSKY CORPORATE ADVISORS, APC**
901 Dove. St, Ste. 120
Newport Beach, CA 92660
(949) 200-6837
Email: smirsky@mirskycorporateadvisors.com.
*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

SDLA COURIER SERVICE, INC., a California corporation; and JAMES GOODMAN, JR., an individual,

Plaintiffs.

v.

UNLIMITED CAPITAL, LLC, a Connecticut limited liability company; TRITON RECOVERY, LLC, a Florida limited liability company; SAMUEL STERNS, an individual; LEOPOLD VARGAS, an individual; ERICA GILERMAN, an individual; and DOES 1-20.

Case No.:
Hon.

**VERIFIED COMPLAINT FOR**:

1. **RICO**, 18 U.S.C. §1962

2. **Conspiracy**, 18 U.S.C. § 1962(d)

3. **Usury**, Cal. Const. Art. XV, Sec. 1 and Cal. Civ. Code § 1916-3

4. **Unfair and Deceptive Acts and Practices**, Cal. Bus. & Prof. Code § 17200

5. **Intentional Interference with Contractual Relations**

6. **Breach of Contract**

7. **Breach of Implied Covenant of Good Faith & Fair Dealing**

8. **Fraudulent Misrepresentation**

9. **Unjust Enrichment**

**COMPLAINT**

PLAINTIFFS SDLA COURIER SERVICE, INC. ("**SDLA**") and JAMES GOODMAN, JR ("**Goodman**") (collectively, "**Plaintiffs**"), by and through their undersigned attorney, bring this suit against DEFENDANTS UNLIMITED CAPITAL, LLC, a Connecticut limited liability company ("**Unlimited**"), TRITON RECOVERY, LLC, a Florida limited liability company ("**Triton**"), Samuel Sterns, an individual ("**Sterns**"), Leopold Vargas, an individual ("**Vargas**"), Erica Gilerman, ("**Gilerman**"), DOES 1-20 (collectively, "**Defendants**") and hereby alleges as follows:

**INTRODUCTION**

1. Plaintiff SDLA is a California business engaged in providing courier services for its only customer, Amazon Inc ("**Amazon**"). Prior to the events giving rise to this Complaint, SDLA was the nation's largest courier service provider for Amazon and employed dozens of people. Although SDLA has operated profitably for nearly a decade, SDLA has required financing to support its growth. When SDLA was unable to receive funding in a timely manner from commercial banks, it fell prey to a business financing scheme known as "Merchant Cash Advance" or "MCA" financing. As a result of the Merchant Cash Advance Agreements and the predatory lending and collection practices of the Defendants, in a period of less than a year, SDLA went from a profitable enterprise to an insolvent enterprise as Defendants froze SDLA's bank accounts, which, in turn, resulted in Amazon terminating its contract with SDLA.

2. SDLA's dramatic and rapid downfall was a direct result of concerted fraudulent and illegal lending practices of Defendants, Unlimited Capital, LLC, and its affiliated entities and persons, including Triton Recovery, LLC, that California law defines as "loan sharking"[1].

---

[1] Cal. Civ. Code § 1916-3 ((b) Any person who willfully makes or negotiates, for himself or another, a loan of money, credit, goods, or things in action, and who directly or indirectly charges, contracts for, or receives with respect to any such loan any interest or charge of any nature, the value of which is in excess of that allowed by law, is guilty of **loan-sharking**, a felony, and is punishable by imprisonment in the state prison for not more than five years or in the county jail for not more than one year.")

Defendants and their affiliates are lending money at extremely high rates of interest, under unlawful conditions, and with draconian consequences for non-payment.

3.  In an effort to bypass California and federal laws, Defendants have been operating in concert with each other to engage in so-called "Merchant Cash Advance" transactions, which are carefully disguised predatory loans.  By avoiding the words "loan" and "interest" and invoking favorable procedural laws in foreign states that have nothing to do with the commercial terms of the transaction, Defendants intentionally sought to evade legal requirements for conducting business in the State of California and with California businesses. As a result, the transactions between SDLA and Defendants failed to comply with the California's Constitutional prohibitions on usurious loans, a California lender's license required by California Financial Code §§ 22000, *et seq*., and failure to comply with  numerous other laws, including Cal. Corp. Code §§ 2105, 2203 and Cal. Rev. & Tax. Code § 23304.1.

4.  Defendant Unlimited made at least two (2) usurious loans to SDLA and guaranteed by Plaintiff Goodman, one of which is at issue in this Complaint (the "**MCA Agreement**"). According to the MCA Agreement, Unlimited provided SDLA with a sum of money equal to $340,000 in exchange for an absolute obligation to repay Unlimited $989,340.00 over a term of 110 days, the equivalent of a 235% loan. It is against this background that Plaintiffs file this Complaint.

5.  Defendants, all affiliated with Unlimited, collectively operate as a classic predatory lender, whose unlawful and fraudulent business practices, coupled with unlawful collection tactics destroy California businesses while unjustly enriching themselves.

6.  Pursuant to the "Merchant Agreement", i.e. the MCA Agreement, Unlimited purportedly paid lump sums of cash to SDLA to allegedly purchase SDLA's future receivables at a discount and SDLA, in turn, agreed to repay the face value of its receipts through daily payments to Unlimited.

7.  While nominally identified as a purchase of future receivables, the terms of the MCA Agreement, along with the Defendants' actions, demonstrate that despite the form of their agreement, no sale of actual receivables took place and that the form of the MCA agreement

1  was merely a sham to evade applicable lender and usury laws. In reality, the parties entered into

2  a transaction where the effective interest rate exceeded 235% - a rate far greater than the

3  maximum 10% permitted under California law by a lender without a California Finance

4  Lender's License.

5      8. Unlimited, pursuant to the terms of the MCA Agreement, and by its conduct, does not

6  bear the risk that would ordinarily be associated with a true sale. Instead, the MCA Agreement

7  transfers all risk to Plaintiffs, as borrower. As a result, Unlimited never made a *bona fide*

8  purchase of SDLA's receivables and the transaction constitutes a usurious loan.

9      9. Plaintiff SDLA already requested and obtained a temporary restraining order relating to

10  the MCA Agreement in Connecticut state court. But, under financial duress, SDLA was induced

11  to enter into a settlement agreement to strictly enforce the same fraudulent and usurious

12  structure as the MCA Agreement. Defendants know that it was impossible for SDLA to comply

13  with its terms – but pushed them to sign the settlement agreement or otherwise face bankruptcy.

14      10. The State of California's usury limitations are a fundamental policy of the State of

15  California that are enshrined in Article XV of the California Constitution.  California courts

16  have rejected efforts to suborn, evade, or dilute this fundamental legal protection for California

17  individuals and businesses through artifice, fraud, deceit, and clever drafting.

18      11. This action encompasses various state and federal causes of action relating to the

19  usurious loan and unconscionable agreements, as well as Defendant's conduct to collect on

20  them, including broader claims for violations of the Racketeer Influenced and Corrupt

21  Organizations Act ("**RICO**") and Conspiracy.

22      12. The causes of action are brought against Unlimited, its affiliate Triton, and three

23  affiliated persons Sterns, Vargas, Gilerman, and Does 1-20 for their roles in the predatory

24  practices at issue in this matter.

25                                   **JURISDICTION AND VENUE**

26      13. This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1331. This

27  Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a) as such

28

1   claims are so related to the claims in the action within such original jurisdiction and contain the

2   same nucleus of facts that they form the same case or controversy.

3       14. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) as a substantial

4   part of the events or omissions giving rise to the claim occurred in this jurisdiction.

5       15. This Court has personal jurisdiction over the nonresident Defendants because they (1)

6   purposefully directed activities and consummated the MCA Agreement with a California

7   resident; (2) the claims arise from or relates to the Defendants' forum-related activities in

8   making and attempting to collect on a usurious loan; (3) upon information and belief,

9   Defendants solicit or engage in business in the forum state; (4) upon information and belief, the

10  Defendants conspired to engage in unlawful activity within the forum state; and (5) exercise of

11  jurisdiction comports with due process notions of fair play and substantial justice.

12                              **THE PARTIES**

13      16. Plaintiff SDLA Courier Services, Inc. ("SDLA") is a California corporation with a

14  principal place located at 1865 W. 222nd Street, Ste. B, Torrance, CA 90501, which is located

15  in the Central District of California.

16      17. Plaintiff James Goodman, Jr. ("Goodman") is an individual and sole shareholder of

17  SDLA.

18      18. Defendant Unlimited Capital LLC ("Unlimited") is a Connecticut limited liability

19  company with a principal place of business located at 500 W. Putnam Ave., Ste. 400, Greenwich,

20  CT 06830. Upon information and belief, Unlimited also operates out of offices located at 2613

21  E16th St, Brooklyn, NY 11235 without being registered as a foreign limited liability company

22  in the State of New York. Upon information and belief, Unlimited is not registered as a foreign

23  limited liability company in the State of California. Upon information and belief, Unlimited

24  Capital is not possession of a California Finance Lender's License granted by the State of

25  California, Department of Financial Protection and Innovation.

26      19.  Defendant Triton Recovery LLC ("Triton") is a Florida limited liability company with

27  a principal place of business located at 19790 W. Dixie Hwy 301, Miami, FL 33180. Upon

28

1  information and belief, Triton is not registered as a foreign limited liability company in the

2  State of California or in the State of New York.

3      20. Defendant Samuel Sterns ("Sterns") is an individual residing in an unknown location.

4  Upon information and belief, Sterns is an officer and/or agent of Unlimited.

5      21. Defendant Leopold Vargas ("Vargas") is an individual residing in an unknown location.

6  Upon information and belief, Vargas is the Chief Executive Officer of Unlimited.

7      22. Defendant Erica Gilerman ("Gilerman") is an individual residing in an unknown

8  location.  Upon information and belief, Gilerman is the Chief Legal Officer of Triton.

9      23. Defendant Does 1-20 are other individuals or entities, presently unidentified, that upon

10 information and belief are also engaged, directly or indirectly, in the conduct giving rise to this

11 Complaint. Plaintiffs are unaware of the names of these other potential defendants who may be

12 responsible for the unlawful practices, acts, conduct, and occurrences alleged therein. Plaintiffs

13 will seek leave of the Court to amend this Complaint to allege the true names and capacities of

14 these unknown defendants and to detail the roles they played, once their identities and/or

15 manner of participation in the wrongful conduct herein is ascertained.

16     24. Upon information and belief, at all relevant times and as alleged more fully herein, each

17 Defendant acted as an agent, servant, employee, co-conspirator, alter-ego and/or joint venturer

18 of one or more of the other Defendants, and in doing the things alleged herein, acted within the

19 course and scope of such agency, employment, alter-ego and/or in furtherance of the joint

20 venture. Upon information and belief, each of the Defendants' acts alleged herein were done

21 with the permission and consent of each of the other Defendants.

22 **BACKGROUND OF MCA INDUSTRY**

23     A.  The Predatory MCA Industry

24     25. The merchant cash advance ("**MCA**") industry specializes in providing high-risk, high

25 interest rate loans to small and mid-size businesses.  As a whole, the MCA industry seeks to

26 hide within the gray areas of the law, attempting to take advantage of procedural remedies and

27 loopholes in distant state courts to disguise its predatory lending practices.

28

26. The Federal Deposit Insurance Corporation ("**FDIC**") has stated that "predatory lending" involves at least one of the following elements: (1) making unaffordable loans based on the assets of the borrower rather than on the borrower's ability to repay an obligation; (2) inducing a borrower to refinance a loan repeatedly in order to charge high points and fees each time the loan is refinanced…; or (3) engaging in fraud or deception to conceal the true nature of the loan obligation, or ancillary products, from an unsuspecting and unsophisticated borrower."[2]

27. MCA companies frequently require unaffordable payments that they know the debtor is unlikely to repay. They further leverage various legal and contractual processes to guarantee full repayment under the contracts. Generally speaking, MCA companies will sue a borrower with the intent to obtain a default judgement, knowing that the borrower is unlikely to retain counsel because they cannot afford it. In other cases, MCA companies will initiate a lawsuit with the intent of forcing a borrower to enter into an onerous settlement agreement, whereby a debtor remains obligated to make all the remaining payments and waive any rights to prosecute a claim against the MCA lender.

B. *MCA Agreements Are Substantively and Procedurally Unconscionable*

28. Generally, MCA agreements are unconscionable contracts of adhesion that are not negotiated at arms-length. MCA agreements further target businesses facing a cash crunch and possible closure.

29. Such agreements often contain many one-sided terms that seek to place all risk of loss on the borrower and maximize the lender's ability to collect full payment under the contract.

30. Among the one-side terms that are typical in MCA agreements are: (1) a provision giving the MCA company an irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name; (2) a provision preventing the merchant from transferring, moving or selling the business or any assets without permission from the MCA company, (3) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way

---

[2] https://www.fdic.gov/news/financial-institution-letters/2007/fil07006a.html

1  around; (4) venue and choice-of-law provisions requiring the merchant to litigate in a foreign

2  jurisdiction under the laws of a foreign jurisdiction with substantive law more favorable to the

3  MCA company, (5) waivers of the borrower's procedural defenses; (6) a personal guarantee,

4  the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver,

5  (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets,

6  (10) a prohibition against obtaining financing from other sources, (11) an assignment of lease

7  of the merchant's premises in favor of the MCA company, (12) the right to direct all credit card

8  processing payments to the MCA company, (13) a power-of-attorney permitting the MCA

9  lender to take any action or execute any instrument or document to settle all obligations due;

10  and (16) consent to electronic communications on behalf of the merchant and the merchant's

11  associates in order to collect payment.

12      31.      Generally, MCA agreements are also unconscionable because they contain

13  numerous knowingly false statements. Among these knowingly false statements are that: (1)

14  the transactions are not loans, (2) the weekly payment is a good-faith estimate of the receivables,

15  (3) the fixed weekly payment is for the borrower's convenience, (4) there is no repayment term;

16  (5) the automated ACH program is a labor-intensive (and not automated) process requiring the

17  MCA company to charge an exorbitant ACH Program Fee or Origination Fee.

18      32.      In addition, the MCA Agreements are unconscionable because they are designed

19  to fail and cause the merchant to default. Among other things, the MCA Agreements are

20  designed to result in a default in the event that the merchant business suffers any downturn in

21  revenues (1) because the reconciliation provision will not, in any case, result in an adjustment

22  of the daily remittance; (2) by preventing the merchant from obtaining other financing, (3) and

23  by requiring the merchant to continuously represent and warrant that there has been no material

24  adverse changes, financial or otherwise, in such condition, operation, or ownership of the

25  merchant.

26      33. In addition, MCA agreements also generally contain numerous penalties that violate

27  fundamental public policy of California. Among these improper penalties, the MCA agreements

28  (1) require the merchant to sign a confession of judgment entitling the MCA company to

1    liquidated attorneys' fees based on a percentage of the amount owed rather than a good-faith

2    estimate of the attorneys' fees required to file a confession of judgment, (2) accelerate the entire

3    debt upon an Event of Default, and (3) require the merchant to turn over 100% of all of its

4    receivables if it misses just one fixed payment.

## FACTUAL BACKGROUND OF THIS DISPUTE

### The MCA Agreement

7    34. As alleged above, SDLA is a courier service that delivers packages for a single

8    customer: Amazon. Under SDLA's contract with Amazon, SDLA must deliver packages in a

9    certain order and under certain conditions in order to be paid.  Payment from Amazon often

10   comes after significant delays. All of SDLA's revenue came from Amazon.

11   35. Beginning in or around Winter or Spring 2024, SDLA sought financing to assist

12   business growth.  SDLA was induced into signing agreements with Unlimited.

13   36. Unlimited Capital and SDLA entered into at least two (2) separate financing

14   Agreements between March and June 2024. Presently, Unlimited and SDLA are parties to only

15   one MCA Agreement dated June 3, 2024 ("MCA Agreement") because, based on information

16   and belief, debt incurred under the March 2024 agreement was "rolled" into the MCA

17   agreement.

18   37. The MCA Agreement consists of "Terms and Conditions" with several addenda.  Each

19   page of the MCA Agreement is written in an extremely small font size less than 10-point font

20   which makes it hard for the parties to read or understand the contract terms.

21   A. Payment Terms

22   38. The MCA Agreement purportedly purchased SDLA's "future receivables" (*i.e.*,

23   receivables for goods and services that have not yet been rendered and do not yet exist), in

24   exchange for a sum of money.

25   39. The MCA Agreement alleges that Unlimited purchased $989,340.00 (the "**Purchased**

26   **Amount**") at a purchase price of $660,000.00 (the "**Purchase Price**") in exchange for daily

27   remittances of $8,999.00 (the "**Remittance**").

28

40. Unlimited, in its sole discretion, determined the Purchased Amount, the Purchase Price, and the Remittance. SDLA did not have any right to determine the value or the payment structure of the so-called "sale." As a result, the MCA Agreement does not constitute a *bona fide* credit sale.

41. The MCA Agreement alleges that Unlimited calculated the Remittance as a "good faith estimate" of "(a) the Purchase Percentage multiplied by (b) the daily average revenues of Merchant during the previous calendar month divided by (c) the number of Business Days…in such calendar month." The MCA Agreement does not specify how Unlimited defines the Purchased Percentage nor how it obtains the value for the "daily average revenues of Merchant during the previous calendar month."

42. The MCA Agreement further provides that Unlimited will "debit an amount equal to the Remittance…until such time that [Unlimited] receives payment in full of the Purchased Amount."

43. Although the MCA Agreement purports to deliver the Purchase Price to SDLA, the MCA Agreement also requires SDLA to "pay" Unlimited certain fees which include an "underwriting fee" equal to "20% of the Purchased Amount" in addition to other fees related to origination fees, ACH fees, wire fees, bank charge fees, and myriad other fees that resulted in a unilateral reduction of the Purchase Price.

44. Bottom line, although Unlimited purported to purchase $660,000.00 of future receivables, upon information and belief, Unlimited only delivered a sum of $340,000.00 to SDLA.

B. The MCA Agreement Transfers Risk of Loss to Borrower

45. The MCA Agreement also contained numerous provisions to transfer risk of loss away from Unlimited and solely onto Plaintiffs. Such provisions include: (1) a sham reconciliation clause; (2) a defined term; (3) the granting of a security interest; (4) a personal guaranty; (5) clauses permitting so-called "Protections Against Default"; and (6) general provisions that grant Unlimited one-sided procedural and substantive rights to enforce the term of the MCA Agreement, such as a prejudgment remedy waiver.

i.  Sham Reconciliation Provision

46. The MCA Agreement contains a conditional reconciliation provision. Section 1.3 entitled "Adjustment to the Remittance" alleges the merchant is permitted to "request a change in the Remittance" to "more accurately reflect the Purchased Percentage of Receipts being collected" once every two calendar weeks provided that an Event of Default has not occurred. As such, the adjustment provision merely permits Unlimited to adjust the Remittance such that it obtains the amount it purchased – it does not permit an adjustment based on the actual performance of the borrower's business.

ii.  Implied Term

47. The MCA Agreement provides an implied payment term, since the Remittance amount is fixed and not subject to actual adjustment. It is possible to determine the implied term by dividing the "Purchased Amount" by the "Remittance Amount."

48. Here, the estimated term is 110 calendar days. In other words, Unlimited expected a 190% return on investment in 110 calendar days.

iii.  Granting of Overly Broad Security Interest

49. The MCA Agreement contains an addendum entitled "Security Agreement" to secure "all of Merchant's payment and performance obligations" under the Agreement.

50. Rather than taking a security interest in merely the future receivables of SDLA, the security agreement grants Unlimited with a security interest in Collateral, which is broadly defined as follows: "(a) all accounts, chattel paper, document, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code in effect in any applicable jurisdiction and as may be amended from time to time, (b) all funds at any time in any Account, regardless of the source of funds; (c) present and future electronic check transactions and (d) all proceeds of the foregoing as such term is defined in Article 9 of the UCC."

51. In addition, under the security agreement, SDLA must also provide "other security to [Unlimited] upon request to secure [SDLA's] obligations under the Agreement."

1    52. The security agreement also permits Unlimited to exercise the security interest "without

2    notice or demand of any kind by making an immediate withdrawal or freezing of the Collateral"

3    and grants Unlimited with the ability to "execute all such instruments and documents in

4    [SDLA's] and Guarantor's name."

5    53. As such, the security agreement grants Unlimited with recourse against the borrower for

6    failure to make a payment against any and all assets of the borrower and the guarantor.

7                iv.  Personal Guaranty

8    54. Unlimited further transfers risk of loss by requiring a personal guaranty from Goodman.

9    55. The Guaranty requires that Guarantor guarantee "jointly and severally" the

10    "performance of all of the representations, warranties, and covenants" in the MCA Agreement

11    and that Guarantor's obligations are "due at the time of any breach…or upon the occurrence of

12    an Event of Default."

13                v.  Protections Against Default

14    56. Section 1.11 sets forth certain "Protections Against Default." In essence, these so-called

15    "protections" are remedies that Unlimited may exercise "immediately and without notice" upon

16    an event that hinders, restricts, or limits Unlimited ability to collect payments under the MCA

17    Agreement.

18    57. Such "protections" permit Unlimited to (1) "collect the full uncollected Purchased

19    Amount plus all fees (including reasonable attorneys' fees" due under this Agreement and the

20    other MCA Documents become due and payable in full immediately"; (2) "enforce the

21    provisions" of the Guaranty against Guarantor; (3) "enforce its security interest in the

22    Collateral"; (4) "proceed to protect and enforce its rights and remedies by lawsuit…and if

23    [Unlimited] recovers a judgment…[SDLA] shall be liable for all of Company's costs of the

24    lawsuit, including but not limited to reasonable attorneys' fees and court costs"; (5) "sign an

25    executed assignment of lease of Merchant's business premises in favor of the [Unlimited]"; and

26    (6) "debit…depository accounts wherever situated by means of ACH debt…for all sums due to

27    Company."

28

58. The MCA Agreement contains broad definitions of Events of Default that are designed to maintain as much control over the borrower's business as possible and to maximize likelihood that a default will occur under normal circumstances. The Events of Default are further designed to eliminate a borrower's ability to defend itself from Unlimited's predatory lending practices and maximize Unlimited's ability to collect the full value of the Purchased Amount.

59. Under Section 3.1, "Events of Default" include, but are not limited to the following: (1) "Merchant or any Guarantor shall violate any term or covenant in this Agreement or any other MCA Document"; (2) "Merchant fails to pay (or cause to be paid) any fees described on Appendix A attached hereto when and as required to be paid…"; (3) "the sending of notice of termination or notifying Company verbally or in writing of its intent to breach this Agreement"; (4) "Merchant shall enter into any financing agreements with any other party…"; and (5) "Merchant shall default under any of the terms, covenants, and conditions of any other agreement with the Company".

60. In other words, an Event of Default will occur unless Unlimited receives the full Remittance on time until it receives the Purchased Amount. If a Merchant attempts to do anything other than make a full payment on time and when due, it is considered an Event of Default. Simply put, the Events of Default are the mechanism by which Unlimited enforces the absolute and unconditional payment obligations under the MCA Agreement.

          vi.  General Positions

61. The MCA Agreement sets forth other provisions that are designed to transfer risk away from Unlimited and grant Unlimited with procedural and substantive protections to increase the likelihood of enforcing the absolute repayment obligations under it.

62. For instance, Section 1.7 states that Unlimited will not be liable "for any claims" under "any legal theory" for "lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by [SDLA] and Guarantor." Further, the provision states that "[SDLA] and Guarantor will be

1    jointly liable for all of Unlimited attorneys' fees and expenses" if SDLA has the audacity to

2    assert a claim against Unlimited.

3        63. Section 4.6 of the MCA Agreement sets forth governing law provisions. The MCA

4    Agreement states that the "Agreement shall be governed by and construed in accordance with

5    the laws of the State of Connecticut, without regards to any applicable principals of conflict of

6    law." The MCA Agreement further states that any actions arising from the Agreement "shall,

7    if the Company so elects, be instituted in any court sitting in Connecticut…" and that SDLA

8    waives "any right to oppose any motion or application made by [Unlimited] to transfer such

9    proceeding to an acceptable forum."

10       64. Upon information and belief, Unlimited has intentionally asserted Connecticut law

11   because it intends to seek a prejudgment remedy without securing a court order under

12   Connecticut General Statutes Sections 52-278a through 52-278m. As such, the MCA

13   Agreement requires SDLA to waive "…all rights to notice and prior court hearing or court order

14   in connection with any and all prejudgment remedies to which [Unlimited] may be entitled by

15   virtue of *any default* or provision in this agreement and...all rights to request that [Unlimited]

16   post a bond…to protect said merchant or guarantor against damages that may be caused by any

17   prejudgment remedy…"(emphasis added). Upon information and belief, this reference to

18   Connecticut law would permit Unlimited to attach its claims to the Purchased Amount to

19   SDLA's assets as a prejudgment remedy without a hearing or court order.

20       65. Section 4.7 requires that all representations, warranties, and covenants "survive the

21   signing and delivery of this Agreement…until all obligations under this Agreement *shall have*

22   *been satisfied in full* and this Agreement shall have terminated." (emphasis added).

23       66. In addition, there are several representations contained in the Agreement which

24   Unlimited knew or should have known that SDLA would breach just by signing the MCA

25   Agreement. In particular, there are representations that "Merchant has good, complete,

26   unencumbered, and marketable title" which Unlimited knew was not the case. Further, there is

27   a clause that states that "Merchant's performance under this Agreement will not cause or create

28

1  an event of default" – which, Unlimited also knew SDLA would violate because it knew that

2  SDLA had other contracts with other merchant cash advance lenders.

3  <center>**The Connecticut Litigation**</center>

4  67. On or about June 25, 2024, SDLA filed a complaint against Unlimited in the Superior

5  Court, Judicial District of Stamford/Norwalk in Connecticut (the "**CT Complaint**").

6  68. The CT Complaint alleged that Unlimited breached the MCA Agreement by failing to

7  conduct an adjustment and for a breach of good faith and fair dealing. Specifically, the CT

8  Complaint alleged that Unlimited requested a change to the Remittance prior to the occurrence

9  of an Event of Default and Unlimited failed to perform its obligations. The CT Complaint

10  further alleged that Unlimited stated that "he was going to make sure that SDLA lost is contract

11  with Amazon and be forced into bankruptcy." The CT Complaint further alleged that Unlimited

12  called SDLA's Chief Executive Officers a "c***sucker" and "mother****er".

13  69. The CT Complaint requested an injunction prohibiting and granting Unlimited from

14  enforcing its rights under the MCA Agreement and from accessing SDLA's bank account,

15  acting pursuant to the power of attorney, and from taking one or more "protections against

16  default" actions.

17  70. Upon information and belief, the court granted a temporary restraining order on June

18  25, 2024.

19  <center>**The Settlement Agreement**</center>

20  71. On or about June 14, 2024, Unlimited entered into an agreement with Triton to collect

21  the debt arising from the MCA Agreement.

22  72. On June 28, 2024, Unlimited granted a power of attorney to Triton.

23  73.  On July 11, 2024 through Triton acting with authority derived from a power-of-attorney

24  and SDLA entered into a Settlement Agreement and Release (the "**Settlement Agreement**")

25  whereby the parties agreed to repay $900,000 in several payments. The first payment consisted

26  of a $250,000 payment via conditional release from Amazon on or before July 12, 2024. The

27  second payment consisted of a $200,000 payment via bank wire on or before July 25, 2024.

28

The last payment of $450,000 would be paid back through daily ACH payments of $5,000.00 from July 15, 2024 through November 22, 2024 or ninety (90) Business Days.

74. The Settlement Agreement also contained a variety of other terms onerous and one-sided terms, including, but not limited to: (1) SDLA withdraw the CT Complaint and thereby withdraw the temporary restraining order; (2) permitting Unlimited to file a UCC Lien Notice to Amazon or commencing legal action for failing to make a payment; and (3) requiring SDLA to "forever refrain and forbear from commencing, instituting, or prosecuting any lawsuit, action or other proceeding to collect or enforce the Merchant Agreement."

75. SDLA signed the Settlement Agreement under economic duress as they believed they had no reasonable alternative but to succumb to the terms of the Settlement or otherwise face bankruptcy or financial ruin.

<div align="center">

**The UCC Lien Notice**

</div>

76. Upon information and belief, Triton, acting on behalf of Unlimited, issued a UCC lien notice to Amazon on August 2, 2024 alleging that SDLA defaulted under its obligations on June 13, 2024 and demanding that Amazon send over all payments owed to SDLA to Unlimited (the "**UCC Lien Notice**").

77. Triton alleged an outstanding balance of $647,378.00 balance occurring on June 13, 2024.

78. On or about August 5, 2024, Amazon, in response to receiving the UCC Lien Notice, terminated SDLA's contract and provided with three hours' notice.

<div align="center">

**FIRST CAUSE OF ACTION**

**RICO, 18 U.S.C. § 1962**

(Against All Defendants)

</div>

79. SDLA repeats and realleges all of the paragraphs in this Complaint as though fully set forth herein.

    A. The Unlawful Activity

80. There are at least three (3) predicate acts underlying the First and Second Causes of Action -- making of unlawful debts (usury); engagement in wire fraud; and collection of unlawful debts – within the past ten (10) years.

81. As set forth more fully above, despite the many false statements and contract terms to the contrary, the financial arrangement between Unlimited and SDLA were loans.

82. California limits the amount of interest that can be charged in connection with providing a commercial loan. Unlimited knowingly made loans to multiple California businesses.

83. Here, the interest rate that Unlimited charged under the MCA Agreement was 235%.

84. The disclosures Defendants made about these loans are clearly fraudulent (for example, the MCA Agreement contains a representation it is a "Sale of Receipts (THIS IS NOT A LOAN)" and violate California usury law, as set forth herein.

85. In the process of making and collecting on these loans, Defendants utilized wire transfers and electronic communications to further their illegal activities.

B.  Culpable Persons

86. Each and every one of the Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation, or limited liability company capable of holding a legal interest in property.

87. At all relevant times, each of the Defendants were, and is, a person that exists separate and distinct from the Enterprise, described below.

88. Upon information and belief, the Defendants had a legal and beneficial interest in the ill-gotten proceeds derived from the Enterprise and knowingly and willfully worked in concert in order to originate and collect upon usurious loans.

C.  The Enterprise

89. The Defendants together constitute an Enterprise (the "**Enterprise**") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

90. The Defendants are associated in fact and through relations of ownerships the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Enterprise has a

1   common goal of soliciting, through an array of brokers, funding, servicing, and collecting upon

2   usurious loans that charge interest at more the enforceable rate under the laws of California.

3       91. Upon information and belief, since at least 2023 and continuing through the present, the

4   members of the Enterprise have had ongoing relations with each other through common

5   control/ownership, shared personnel and/or one or more contracts or agreement relating to and

6   for the purpose of originating, underwriting, servicing, and collecting upon unlawful debt issued

7   by the Enterprise to small businesses throughout the United States, including at least two prior

8   transactions with SDLA.

9       92. Defendant Unlimited entered into the MCA Agreement.

10       93. Unlimited entered into one or more agreements with Triton to enforce the MCA

11   Agreement and to collect any money due and payable under the Agreement.

12       94. Defendant Unlimited, through Triton, entered into the Settlement Agreement to further

13   collect upon the unlawful debt.

14       95. Gilerman and Vargas, using Triton as an instrumentality, used deceptive acts and

15   practices to collect on the unlawful debt.

16       96. The debt evidenced by the MCA Agreement constitutes an unlawful debt within the

17   meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable

18   criminal usury statutes, and (ii) the rates significantly exceed the legal rate permitted under

19   California law.

20       97. The debt evidenced by the Settlement Agreement constitutes an unlawful debt within

21   the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates

22   applicable criminal usury statutes, and (ii) the rates significantly exceed the legal rate permitted

23   under California law.

24       98. Upon information and belief, since at least 2023 and continuing through the present, the

25   members of the Enterprise have had ongoing relations with each other through common

26   control/ownership, shared personnel and/or one or more contracts or agreements relating to and

27   for the purpose of collecting fraudulent fees through electronic wires.

28

1    99. Enterprise's misconduct also constitutes "fraud by wire" within the meaning of 18

2    U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and

3    continuous use of such conduct to participate in the affairs of the Enterprise constitutions a

4    pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

5              D.   The Roles of the RICO Persons in Operating the Enterprise, and the roles of the

6                   individual companies within the Enterprise

7        100.       The Defendants have organized themselves and the Enterprise into a cohesive

8    group with specific and assigned responsibilities and a command structure to operate as a unit

9    in order to accomplish the common goals and purposes of collecting upon unlawful debts,

10   including as follows:

11                                              Sterns

12       101.       Upon information and belief, Sterns is the mastermind of the Enterprise. He is

13   responsible for the day-to-day operations of the Enterprise and has final say on all business

14   decisions of the Enterprise, including, without limitation, which usurious loans the Enterprise

15   will fund, how such loans will be funded, the payments terms, amounts, and period of each

16   usurious loan.

17       102.       In his capacity as the mastermind of the Enterprise, Sterns is responsible for

18   creating, approving, and implementing policies, practices, and instrumentalities used by the

19   Enterprise to accomplish its common goals and purposes, including: (1) the form of the

20   merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as

21   receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's

22   collection of unlawful debts; and (2) the method of collecting the daily payments via ACH

23   withdrawals. All such forms were used to make and collect upon the lawful loans, including,

24   without limitation, loans extended to SDLA.

25       103.       Upon information and belief, Stern has taken actions and directed other

26   members of the Enterprise to take actions necessary to accomplish the overall goals and

27   purposes of the Enterprise, including, but not limited to, directing the affairs of the Enterprise,

28

funding the Enterprise to collect upon the unlawful debts and executing legal documents in support of the Enterprise.

104.    Sterns has ultimately benefitted from the Enterprise's acquisition of usurious loan proceeds by Unlimited, Triton, Vargas, and Gilerman, and Does 1-20.

<div align="center">Unlimited</div>

105.    Upon information and belief, Unlimited is organized under the laws of Connecticut and maintains officers, books, records, and bank accounts independent of Sterns and the other Defendants.

106.    Upon information and belief, Sterns has operated Unlimited as part of an unlawful enterprise to collect upon unlawful debts and commit wire fraud. Pursuant to its membership in the Enterprise, Unlimited, has, upon information and belief: (1) entered into contracts with brokers to solicit borrowers to identify targets to grant the Enterprise's usurious loans; (2) underwritten the usurious loans and determined the ultimate rate of interest to be charged under each loan; (3) entered into so-called merchant cash advance agreements on behalf of the Enterprise; (4) serviced the usurious loans; and (5) set up and implemented the ACH withdrawals used by the Enterprise to collect on the unlawful debt.

107.    Unlimited, upon information and belief, solicited SDLA, through one or more brokers, and underwrote the MCA Agreement, entered into the MCA Agreement, and collected upon unlawful debt by effectuating daily ACH withdrawals and other payments from SDLA's accounts.

<div align="center">Triton</div>

108.    Upon information and belief, Triton has entered into certain agreements with Unlimited to collect upon the unlawful debts.

109.    Triton, through Gilerman and Vargas, have operated in such a manner to use unfair and deceptive trade practices to collect upon the unlawful debt and benefit from the ill-gotten proceeds derived therefrom.

<div align="center">Vargas</div>

110.    Upon information and belief, Vargas is the CEO of Triton and conspired with Sterns and Unlimited to conduct the Enterprise. Specifically, Vargas and Sterns and/or Unlimited collaborated in creating and enforcing the Settlement Agreement to gain control over SDLA's assets.

<div align="center">Gilerman</div>

111.    Upon information and belief, Gilerman is the Chief Legal Officer of Triton and provides certain legal advisory services to Unlimited.  Gilerman was the main person seeking to collect and enforce unlawful debt obligations.

112.    Upon information and belief, Gilerman also formed and filed Unlimited's Articles of Organization with the Connecticut Secretary of State. Upon information and belief, Gilerman advised Sterns and/or Does 1-20 to form an entity in Connecticut in order to take advantage of the prejudgment remedy in order to collect unlawful debts in a more expedient manner.

E.    Interstate Commerce

113.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

114.    Upon information and belief, all of the transactions relevant to this case were conducted through ACH payments and all communications were conducted through phone, text, or electronic messaging.

115.    Upon information and belief, the Enterprise received funds collected from other illegal activities conducted within the State of California and elsewhere in the United States of America.

116.    Further, members of the Enterprise maintain offices in Connecticut, Florida, and New York. The Enterprise also use personnel in these offices to originate, underwrite, fund, service, and collect upon the usurious loans made by the Enterprise through the extensive use of instrumentalities of interstate commerce, including emails, mail, write transfers, and bank withdrawals processed through an automated clearing house.

1     117.    In the present case, all communications between the members of the Enterprise

2  and SDLA were conducted by interstate email and mail, wire transfers, or ACH debits and other

3  interstate wire communications. Specifically, the Enterprise used interstate emails to originate,

4  underwrite, service, and collect upon the MCA Agreement and the Settlement Agreement, fund

5  the advances under each of the MCA Agreement, and collect the payments via electronic ACH

6  debits.

7         F.  Injury and Causation

8     118.    SDLA has been and will continue to be injured in its business and property by

9  reason of the Defendant's violations of 18 U.S.C. § 1962(c).

10    119.    The injuries to SDLA were directly, proximately, and reasonably foreseeably

11  resulted from or caused by these violations, including, but not limited, thousands of dollars

12  improperly collected by criminally usurious loan payments, breaches of agreements with third

13  parties, the freezing of bank accounts, and laying off all employees as SDLA had no source of

14  income.

15    120.    SDLA has also suffered damages by incurring substantial attorneys' fees and

16  costs associated with exposing and prosecuting the Defendants' criminal activities.

17    121.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus

18  costs and attorneys' fees from Defendants.

19    122.    Plaintiffs are experiencing on-going harm for which money damages would not

20  be adequate.

21

22                **SECOND CAUSE OF ACTION**

                    **Conspiracy, 18 U.S.C. § 1962(d)**

23

                    (Against All Defendants)

24

25    123.    Plaintiffs repeat and reallege all of the paragraphs in this Complaint as though

26  fully set forth herein.

27

28

1    124.    Defendants have unlawfully, knowingly, and willfully, combined, conspired,

2    confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation

3    of 18 U.S.C. § 1962(d).

4    125.    By and through each of the Defendants' business relationships with one another,

5    their close coordination with one another in the affairs of the Enterprise, and frequent use of

6    email communications among the Defendants concerning the underwriting, funding, servicing,

7    and collection of the unlawful loans, including the MCA Agreement and Settlement Agreement,

8    each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise

9    extended beyond each Defendant's individual role. Moreover, through the same connections

10    and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy

11    to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

12    126.    Each Defendant agreed to facilitate, conduct, and participate in the conduct,

13    management, or operation of the Enterprise's affairs in order to collect upon unlawful debts,

14    including the Agreements, in violation of 18 U.S.C. § 1962(c). In particular, each Defendant

15    was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the

16    Defendants shared a common purpose, namely, the orchestration, planning, preparation, and

17    execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including

18    the MCA Agreements.

19    127.    Each Defendants agreed to facilitate, conduct, and participate in the conduct,

20    management, or operation of the Enterprise's affairs in order to commit wire fraud through a

21    pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

22    128.    The participation and agreement of each of the Defendants was necessary to

23    allow the commission of this scheme.

24    129.    Plaintiffs have been and will continue to be injured in its business and property

25    by reason of Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at

26    trial.

27    130.    The injuries to SDLA directly, proximately, and reasonably foreseeably

28    resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to,

1   thousands of dollars in improperly collected loan payments, termination of third-party

2   agreements based on the Defendants' conduct, and the termination of employees resulting from

3   Defendants' conduct.

4   131.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs

5   associated with exposing and prosecuting Defendant's criminal activities.

6   132.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus

7   costs and attorneys' fees from Defendants.

8

9                                **THIRD CAUSE OF ACTION**

10              **Usury, Cal. Const. Art. XV, Sec. 1 and Cal. Civ. Code § 1916-3**

11                              (Against Unlimited and Triton)

12   133.    Plaintiffs repeat and reallege all of the paragraphs in this Complaint as though

13   fully set forth herein.

14   134.    The MCA Agreement constitutes a loan as defined in Cal. Civ. Code § 1912.

15   135.    The Settlement Agreement constitutes a loan as defined in Cal. Civ. Code § 1912.

16   136.    All repayments made, or called for, under the MCA Agreement and the

17   Settlement Agreement in excess of the legally permissible amount constitute interest as defined

18   in Cal. Civ. Code § 1915.

19   137.    Defendants Unlimited and Triton, by the terms of the agreements and through

20   their actions, demonstrated that the loan and interest were absolutely repayable by Plaintiffs.

21   138.    Defendants Unlimited and Triton do not have a California Finance Lender's

22   license pursuant to Cal. Fin. Code § 22000, *et seq.* and do not otherwise meet the requirements

23   for exemption from the usury limitation when entering into the MCA Agreement or the

24   Settlement Agreement.

25   139.    Defendants Unlimited and Triton, through the terms of the MCA Agreement,

26   the Settlement Agreement, and by their actions, knowingly, willfully, and intentionally charged

27   interest on the sums advanced in excess of California's usury limitations.

28

1    140.    Plaintiffs will experience immediate and irreparable injury, loss, or damages, for

2    which money damages will not be adequate.

3

4

                            **FOURTH CAUSE OF ACTION**

5

      **Unfair and Deceptive Acts and Practices, Cal. Bus. & Prof. Code § 17200**

6

                       (Against Unlimited, Triton, and Does 1-20)

7

8    141.    Plaintiffs repeat and reallege all of the paragraphs in this Complaint as through

9    fully set forth herein.

10    142.    Defendants Unlimited, Triton, and Does 1-20 engaged in unfair business

11    practices as defined in *Cal. Bus. & Prof. Code* § 17200, specifically, they engaged in (1) "acts

12    or practices which are unlawful and/or or unfair, or (2) fraudulent; and (3) the MCA Agreements

13    were unconscionable.

14    143.    Specifically, Defendants engaged in one or more of the following unlawful,

15    unfair, and/or fraudulent practices:

16          i.   Violation of California Constitution, Article XV, Section 1, prohibitions against

17               usury.

18          ii.  Lending without a CFL License in violation of Fin. Code § 22000. *et seq.*

19          iii. Conducting business within the State of California without having first obtained

20               a certificate of qualification from the Secretary of State of California in violation

21               of Cal. Corp. Code §§ 2105 and 2203.

22    144.    In addition, the MCA Agreement and the Settlement Agreement were

23    procedurally and substantively unconscionable. The terms of the MCA Agreement and the

24    Settlement Agreement constitute contracts of adhesion, where the contract terms were outside

25    the reasonable expectations of the weaker party and were unduly oppressive. Further, the MCA

26    Agreement was written in a font so small as to be barely legible without magnification and

27    SDLA had no bargaining power to negotiate the MCA Agreement and the Settlement

28    Agreement and did not have any other meaningful choice. Further, the MCA Agreement and

1 | the Settlement Agreement were substantively unconscionable because the terms of the

2 | agreement reallocate risks such that Plaintiffs bear all risk in a manner that shocks the

3 | conscience and violates public policy.

4 |     145.    Plaintiffs will experience immediate and irreparable injury, loss, or damage for

5 | which money damages will not be adequate.

6

7 | <div style="text-align:center">**FIFTH CAUSE OF ACTION**</div>

8 | <div style="text-align:center">**Intentional Interference with Contractual Relations**</div>

<div style="text-align:center">(Against Unlimited and Triton)</div>

9

10 |     146.    Plaintiffs repeat and reallege all of the paragraphs of the Complaint as if fully

11 | set forth herein.

12 |     147.    Upon information and belief, SDLA had entered into a contract with Amazon to

13 | provide courier services (the "**Amazon Agreement**").

14 |     148.    At all relevant times, the Amazon Agreement was valid and enforceable.

15 |     149.    Unlimited and Triton had knowledge of the Amazon Agreement and knew that

16 | Amazon was SDLA's only customer.

17 |     150.    Defendants Unlimited and Triton disrupted the relationship by placing a UCC

18 | Lien Notice on August 2, 2024 on moneys held by Amazon on behalf of SDLA, thereby

19 | disrupting SDLA's right to receive payment from Amazon and adversely impacting its ability

20 | to pay SDLA's employees because SDLA was unable to obtain revenue. As a result, Amazon

21 | terminated the Amazon Agreement with SDLA on August 5, 2024.

22 |     151.    Unlimited and Triton knew that the interference with the contractual relationship

23 | between SDLA and Amazon was certain or substantially certain to occur because Unlimited

24 | had issued correspondence to SDLA stating that it "was going to make sure that SDLA lost is

25 | contract with Amazon and be forced into bankruptcy."

26 |     152.    As a direct, foreseeable, and proximate result of Unlimited and Triton's actions

27 | Plaintiffs suffered economic harms, including direct and consequential damages loss of profits,

28

future profits, and diminution of value in the business in an amount estimated to be $15 Million Dollars.

153.    Pursuant to Cal. Civ. Code § 3294, Unlimited and Triton engaged in conduct that was fraudulent, oppressive, and malicious, thereby warranting punitive damages in an amount to be determined at trial.

154.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with Unlimited and Triton's brazen, malicious, and fraudulent conduct.

155.    Plaintiffs will also experience immediate and irreparable injury, loss, or damages for which money damages will not be adequate.

<div align="center">

**SIXTH CAUSE OF ACTION**

**Breach of Contract**

(Against Unlimited)

</div>

156.    Plaintiffs repeat and reallege all of the paragraphs in this Complaint as though fully set forth herein.

157.    SDLA and Unlimited entered into the MCA Agreement.

158.    On June 13, 2024, no Event of Default had occurred and SDLA had requested a change in the Remittance amount pursuant to Section 1.3 of the MCA Agreement.

159.    Unlimited did not modify the amount of the Remittance to more closely reflect SDLA's actual receipts.

160.    As such, Unlimited failed to perform its obligations under the MCA Agreement, constituting a material breach of the MCA Agreement.

161.    Plaintiffs were harmed as a result in amounts and in manner subject to proof at trial.

162.    Unlimited's breach was a substantial factor in causing Plaintiffs' harm.

<div align="center">

**SEVENTH CAUSE OF ACTION**

**Breach of Implied Covenant of Good Faith and Fair Dealing**

(Against Unlimited and Triton)

</div>

163.    Plaintiffs repeat and reallege all of the paragraphs in this Complaint as though fully set forth herein.

164.    SDLA has attempted to work with Unlimited and Triton in good faith by giving notice to Unlimited that it requested a modification to the Remittance and by informing Triton that it was unable to comply with the terms of the Settlement Agreement because other merchant cash advance lenders had frozen its bank accounts.

165.    Unlimited and Triton prevented Plaintiffs from receiving the benefits under the MCA Agreement and Settlement Agreement by providing assistance with the financing of business operations.  Unlimited and Triton created agreements and repayment obligations that made it impossible for SDLA to perform and actually conduct business. Unlimited and Triton knowingly created these contracts with the intent that SDLA would fail to meet its obligations in order to extract as much money from the business as possible.

166.    By doing so, Unlimited and Triton acted in bad faith.

167.    Plaintiffs were harmed by Unlimited and Triton's conduct in an amounts to be determined at trial.

### EIGHTH CAUSE OF ACTION

### Fraudulent Misrepresentation

(Against All Defendants)

168.    Plaintiffs repeat and reallege each and every paragraph of this Complaint as if fully set forth herein.

169.    Defendants presented to SDLA agreements which contained, within their language, intentional misrepresentations, including, but not limited to, the following: (1) statements that the arrangements were "sales" and "not loans"; (2) representations that payments did not constitute interest, when in fact, the rate was in excess of 200%; and (3) that Unlimited bore the risk of loss of a slowdown in SDLA's business operations.

170.    Defendants knew that the representations were false or made the representations recklessly and without regard for the truth.

171.    Plaintiffs reasonably relied on Defendants' representations and were induced to enter into the MCA Agreement and the Settlement Agreement by these fraudulent and deceitful representations.

172.    Plaintiffs were harmed in amounts and in a manner subject to proof at trial, including, but not limited to, all interest paid on the loans under the MCA Agreement and Settlement Agreement above the legally permissible rate represented by Defendants.

173.    Plaintiff's reliance on these representations was a substantial factor in causing its harm. Plaintiffs paid Defendants at least $800,000.00 under the merchant cash advance agreements.

174.    Entering into these Agreements and the Defendants' unlawful collection practices caused Amazon to terminate its contract with SDLA.

## NINTH CAUSE OF ACTION

### Unjust Enrichment

(Against Unlimited and Triton)

175.    Plaintiffs repeat and reallege all of the paragraphs of this Complaint as though fully set forth herein.

176.    Unlimited and Triton were unjustly enriched when it received repayments in excess of amounts that would be permissible under California law, a benefit that it would not have otherwise obtained thought a legally compliant loan process.

177.    Unlimited and Triton have been unjustly enriched in amounts subject to proof at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs seek judgment against the Defendants as follows:

A.    Direct damages according to proof at trial, estimated to be $15 Million Dollars;

B.    Compensatory, indirect, and consequential damages according to proof at trial;

C.    Treble damages under 18 U.S.C. § 1964(c);

D.      An order preventing and restraining Sterns, Vargas, and Gilerman from engaging in the activities of the Enterprise and divesting all of their respective interests in Unlimited and Triton under 18 U.S.C. § 1964 (a);

E.      Voiding the MCA Agreement pursuant to Cal. Rev. & Tax Code § 23304.1;

F.      Voiding the Settlement Agreement pursuant to Cal. Rev. & Tax Code § 23304.1;

G.      Punitive damages as allowed by law;

H.      Restitution;

I.      Attorneys' fees and cost, as permissible under law; and

I.      Such other and further relief as this case may require and the Court deems just and proper.

Date:   September 4, 2024                          **MIRSKY CORPORATE ADVISORS, APC**


By:_____

Steven J. Mirsky,

Attorney for Plaintiffs

1     **VERIFICATION**

2  I, John Goodman, declare as follows:

3     1.   I am the Chief Executive Officer of SDLA Courier Service, Inc, a party to this action.

4     2.   I have read the foregoing Complaint and know its contents.

5     3.   I am authorized to make this verification for SDLA Courier Service, Inc. and make this

6  verification for that reason.

7     4.   The matters stated in the Complaint are true to my own knowledge, except as to matters

8  which therein are stated upon information or belief, and, as to those matters, I believe them to

9  be true.

10

11  I declare under penalty of perjury under the laws of the State of California that the foregoing is

12  true and correct.

13

14  **SDLA Courier Service, Inc.**

15

16  By:   _____

17  Name: John Goodman

18  Title:   CEO

19

20  Dated: September 4, 2024

21

22

23

24

25

26

27

28